IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OMAR MOHAMMED KHALIFH, *et al.*, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 05-CV-1189 (JR) |
| ) | |
| GEORGE W. BUSH, *et al.*, ) | |
| ) | |
| Respondents. ) | |

**PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONER AND THE COURT WITH 30-DAYS' ADVANCE NOTICE OF ANY INTENDED REMOVAL FROM GUANTANAMO**

Petitioner Omar Mohammed Khalifh respectfully submits this Memorandum in support of his application for the immediate issuance of injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1651 (the "All Writs Act"), requiring Respondents to provide the Court and counsel at least thirty (30) days' advance notice of any intended removal of Petitioner from Guantánamo Bay Naval Station ("Guantánamo"). The relief sought by Petitioner would not tie the Government's hands, but would simply maintain the *status quo* until the courts have the opportunity to consider the legality of the transfer before it becomes a *fait accompli*.

Petitioner's request arises from urgent circumstances, made known over the past few weeks that pose a significant risk to Petitioner's safety and directly affect Petitioner's habeas proceedings before the Court. On Friday, March 11, 2005, *The New York Times* reported Respondents' intention to transfer hundreds of detainees from Guantánamo to prisons in Saudi

Arabia, Pakistan and Yemen. *See* Douglas Jehl, *The Reach of War: Guantánamo; Pentagon Seeks to Shift Inmates From Cuba Base,* N.Y. Times, Mar. 11, 2005, at Al ("*Pentagon Seeks to Shift Inmates*"), attached as Exh. A to the accompanying Declaration of Edmund Burke ("Burke Decl."). On July 20, 2005, the Department of Defense confirmed that sixty-seven detainees have thus far been transferred to the control of other Governments and that "the Department expects that there will be other transfers[.]" *See* U.S. Dep't of Defense, News Release, *Detainee Transfer Announced*, No. 739-05, July. 20, 2005 (Exh. B to Burke Decl.). Respondents' past practices transferring detainees away from Guantánamo is described in the two declarations of Matthew C. Waxman, Deputy Assistant Secretary for Detainee Affairs in the Department of Defense, dated March 8 and March 16, 2005. *See* Exh. C to Burke Decl. The declaration discloses that as of March 8, 2005, sixty-five detainees had been transferred to the control of their home governments for further detention, investigation and prosecution. A total of 211 detainees had been transferred away from Guantanamo. (Waxman Decl. ¶ 4). In each case, the government loses all control of the detainees once transferred. (Waxman Decl. ¶ 5).

Thus, absent injunctive relief, Respondents could transfer Petitioner from Guantánamo without allowing Petitioner the opportunity to contest the legality of such a transfer, thus denying Petitioner precisely the relief that he has sought in this proceeding. Furthermore, transfer of detainees to certain countries, including Libya or Saudi Arabia or Egypt, will subject Petitioner to considerable risks of torture, retaliation and indefinite detention. There have been numerous media reports in responsible publications, as well as statements from former detainees, that detainees in such countries have been subjected to torture, abusive interrogation tactics, indefinite imprisonment and denial of access to courts. Accordingly, Petitioner respectfully requests that the Court order Respondents temporarily restrained from removing Petitioner from

Guantánamo unless the Government provides to the Court and counsel at least thirty (30) days' advance notice of the intended removal, thereby permitting a hearing on the legality of the removal.

## STATEMENT OF THE FACTS

Petitioner is a Libyan national who, upon information and belief, is being detained as an "enemy combatant" at Guantánamo. As detailed in the habeas petition filed on June 14, 2005, Petitioner denies any determination that he is an "enemy combatant" and contends he is being detained in violation of the Constitution, treaties and laws of the United States, as well as international law.

If transferred to the custody of Governments that routinely ignore international standards for treatment of detainees, Petitioner will be at great risk of suffering abuse, torture or even death. Although the Government has made efforts to keep its actions secret, there is every reason to believe that the United States has surreptitiously removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is used to facilitate interrogation by subjecting detainees to torture.

According to reports by United States and international media organizations, Respondents have repeatedly transferred detainees into the custody of foreign Governments that employ inhumane interrogation techniques. The process of rendition was originally "a program aimed at a small, discrete set of suspects — people against whom there were outstanding foreign arrest warrants," but after September 11, 2001 it came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing*

*Torture,* New Yorker, Feb. 14, 2005, *available at* http://www.newyorker.com/fact/content/?050214fa_fact6 (last visited July 22, 2005). As reported in the *Washington Post,*

> Since Sept. 11, the U.S. Government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States, bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence sources. The suspects have been taken to countries . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics including torture and threats to families that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *US. Behind Secret Transfer of Terror Suspects,* Wash. Post, Mar. 11, 2002, at Al; *see also* Dana Priest & Barton Gellman, *US. Decries Abuse But Defends Interrogations,* Wash. Post, Dec. 26, 2002, at Al.

The countries to which Petitioner may be brought, according to recent news reports, are known to practice torture. *See, e.g.,* Megan K. Stack & Bob Drogin, *Detainee Says U.S. Handed Him Over for Torture,* L.A. Times, Jan. 13, 2005, at Al ("News accounts, congressional testimony and independent investigations suggests that [the CIA] has covertly delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle Eastern nations where, according to State Department reports, torture has been widely used on prisoners."). For example, Guantánamo detainee Mamdouh Habib, who was rendered to Egypt by the United States prior to his transfer to Cuba, was allegedly tortured, without mercy, during his six-month imprisonment:

> He said that he was beaten frequently with blunt instruments, including an object that he likened to an electric "cattle prod." And he was told that if he didn't confess to belonging to Al Qaeda he would be anally raped by specially trained dogs.... Habib said that he was shackled and forced to stand in three torture chambers: one room was filled with water up to his chin, requiring him to stand on tiptoe for hours; another chamber, filled with water up to his knees, had a ceiling so low that he was forced into a prolonged, painful stoop; in the third, he stood in water up to his ankles,

4

> and within sight of an electric switch and a generator, which his jailers said would be used to electrocute him if he didn't confess.

Mayer, *Outsourcing Torture, supra.*

The credibility of Mr. Habib's account is bolstered by the United States Department of State, which has consistently identified the Egyptian Government as a practitioner of torture. In a report released on February 28, 2005, for example, the State Department found that "there were numerous, credible reports that security forces tortured and mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and prison guards remained common and persistent." Dep't of State, *Country Reports on Human Rights Practices, Egypt 2004,* § 1(c), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm (last visited July 22, 2005).

Petitioner also has reason to fear that he will be transferred into the custody of the Government of Saudi Arabia, or another country, for continued illegal detention without due process of law. Recent news reports indicate that the United States Government has contemplated transferring "large numbers of Afghan, Saudi and Yemeni detainees from the military's Guantanamo Bay, Cuba, detention center into new U.S.-built prisons in their home countries." Dana Priest, *Long-Term Plan Sought for Terror Suspects,* Wash. Post, Jan. 2, 2005, at A1. Disturbingly, the conditions of confinement for detainees in these countries are among the worst in the world. According to experts, the Saudi Arabian criminal justice system is fundamentally lacking in basic due process, and the use of torture or other forms of ill-treatment to extract confessions is commonplace. *See e.g.,* Affidavit of Brian Evans, submitted Sept. 17, 2004 in *Ali* v. *Ashcroft,* No. 04-1258 (3DB) (attached as Exh. D to Burke Decl.). Based on such expert opinions, another Judge of this Court recently found that the allegations of Omar Abu Au — an American citizen claiming that he was being detained and tortured in Saudi Arabia at the

direction of the United States — were sufficiently credible to warrant jurisdictional discovery. *See Ali* v. *Ashcroft,* No. 04-1258 (JDB), 2004 U.S. Dist. LEXIS 25239 at *122 (D.D.C. Dec. 16, 2004).

The Government clearly recognizes the danger to those detained in Saudi Arabia and Yemen. According to the State Department, in Yemen last year "there were reports that members of the . . . police forces tortured and abused persons in detention," and the Yemeni Government "acknowledged publicly that torture occurred." Dep't of State, *Country Reports on Human Rights Practices, Yemen 2004,* § 1(c), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41736.htm (last visited July 22, 2005). In Saudi Arabia, "the Government executed persons for criminal offenses after closed trials," and there were credible reports of "beatings with sticks and suspension from bars by handcuffs." Dep't of State, *Country Reports on Human Rights Practices, Saudi Arabia 2004,* § 1(a), (c) *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41731.htm (last visited July 22, 2005). Human Rights Watch's 2005 World Report for Afghanistan reported "numerous claims of human rights abuses" against U.S. forces, including the "mistreatment of detainees, many of whom are held outside the protection of the Geneva Conventions." *See* Human Rights Watch, World Report 2005: Afghanistan, *available at* http://hrw.org/english/docs/2005/01/13/afghan9827.htm (last visited July 22, 2005). Human Rights Watch has also cited claims that detainees in Afghan military detention facilities have been subjected to torture. *See* Human Rights Watch, 'Enduring Freedom:' Abuses by U.S. Forces in Afghanistan (Mar. 2004), *available at* http://hrw.org/reports/2004/afghanistan0304/3.htm (last visited July 22, 2005).

**ARGUMENT**

This Court has the inherent power, under the All Writs Act, 28 U.S.C. § 1651(a), "to issue injunctions to protect its jurisdiction." *Securities Exchange Comm'n* v. *Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C. Cir. 1996); *Environmental Def. Fund* v. *Environmental Prot. Agency,* 485 F.2d 780, 784 n.2 (D.C. Cir. 1973) (citing All Writs Act for proposition that appellate court had inherent power to issue injunction binding non-parties to protect its jurisdiction over appeal). Further, this Court may issue a temporary retraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure to preserve the status quo between the parties pending a final determination of the merits of the action. *Granny Goose Foods, Inc.* v. *Brotherhood of Teamsters,* 415 U.S. 423, 439 (1974); *see also* 13 Moore's Federal Practice 3D § 65.20 (2004) (stating that "a request for preliminary injunction that seeks to restore the status quo will ordinarily be granted.").

Moreover, Petitioner is entitled to a temporary restraining order because Petitioner can demonstrate (i) irreparable harm to him if this Application is not granted; (ii) a strong public interest in providing the relief Petitioner seeks here; (iii) a likelihood of success on the merits; and (iv) no corresponding injury to Respondents if the restraint is granted. *See Al-Fayed* v. *Central Intelligence Agency,* 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *see also O'Donnell Constr. Co.* v. *District of Columbia,* 963 F.2d 420, 428 (D.C. Cir. 1992); *Virginia Petroleum Jobbers Ass 'n* v. *Federal Power Comm'n,* 259 F.2d 921, 925 (D.C. Cir. 1958).

Where the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Washington Metro. Area Transit Comm 'r* v. *Holiday Tours, Inc.,*

7

559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co.* v. *Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Washington Metro.,* 559 F.2d at 844.

As noted above, Petitioner was compelled to file for a temporary restraining order after learning from an article in *The New York Times* on Friday, March 11, 2005 that Respondents intend to transfer hundreds of detainees to prisons in Saudi Arabia, Pakistan, and Yemen. *See Pentagon Seeks to Shift Inmates, supra.* This report relies heavily on a leaked February 5, 2005 memorandum written by Respondent Defense Secretary Donald H. Rumsfeld, as well as statements from anonymous Defense Department officials indicating for the first time that such a transfer may be imminent.

Petitioner also bases his application for a temporary restraining order on the same immediate, irreparable harm that was the subject of the application granted on March 12, 2005, in a related Guantánamo detainee habeas case, *Abdah* v. *Bush,* No. 04-1254 (HHK) (RN/IC). In the Memorandum Opinion issued by Judge Collyer, the Court granted the *Abdah* petitioners' application for temporary restraining order under reasoning that is equally, if not more, applicable to the instant case. Judge Collyer described the relief sought by the *Abdah* petitioners as follows:

> Thirteen Yemeni nationals, designated as "enemy combatants" at the Guantánamo Bay Naval Base ("GTMO") in Cuba, petition for a temporary restraining order ("TRO") to prevent their removal from GTMO and rendition to the custody of another Government. They argue that such removal and rendition could have the effect of denying them access to U.S. courts for review of their detainment status and also potentially

8

>expose them to interrogation techniques and treatment that would be contrary to the laws of the United States.

*Abdah* Mem. Op., at 1 (attached as Exh. E to Burke Decl.).

The *Abdah* petitioners based their application for a TRO upon the same March 11 press report in *The New York Times* described above. *Abdah* Mem. Op. at 2. That report — along with recent media reports — form the basis of the instant application as well, and the narrow relief Petitioner seeks is the same. In *Abdah,* Judge Collyer reviewed the traditional four-part standard for granting a TRO (discussed in further detail below) before determining that the petitioners were entitled to a TRO restraining the Government from transferring any of them out of Guantánamo for ten days or until such time as the court could rule on petitioners' motion under the All Writs Act, seeking advance notice of the transfer of any Petitioner. *See* Mar. 12, 2005 Amended Order (attached as Exh. E to Burke Decl.).

In seeking advance notice of transfer, Petitioner seeks to preserve the jurisdiction of the federal court and seek an opportunity to contest the legality of Petitioner's removal before such removal becomes a *fait accompli*. Without an order ensuring, at the very least, proper notice before Petitioner is transferred, the continued jurisdiction of the Court in this matter could be undermined by the Government's sudden unilateral action. Indeed, the barriers that counsel in *Abdah* overcame in establishing the precise circumstances their clients faced (which the Court took into consideration in determining that a sufficient showing had been made under the circumstances to warrant relief) were much lower than those faced by the Petitioner's counsel here. In this case, counsel for Petitioner have been unable to contact their client. On this record, the Court should not allow the United States to transfer the Petitioner without affording his counsel an opportunity to be heard.

A. **<u>Petitioner is Likely to Succeed on the Merits</u>**

Petitioner has a strong likelihood of success on the merits. Petitioner is seeking habeas review of the legality of his detention at Guantánamo, a right that the Supreme Court recognized in *Rasul* v. *Bush,* 124 S. Ct. 2686 (2004). Judge Joyce Hens Green has already ruled in eleven related cases that Guantánamo habeas petitioners have rights under the Due Process Clause of the Fifth Amendment and the Geneva Conventions. *In re Guantanamo Detainee Cases*, 355 F. Supp.2d 443 (D.D.C. 2005).

To allow Respondents to remove Petitioner from Guantánamo and place him in the hands of a foreign Government which practices torture would deny his rights without due process of law. It would also violate basic international legal norms embodied not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment and Punishment. Removal without notice would also represent a brazen attempt to strip this court of its jurisdiction over the matter.

As Judge Collyer determined, there is sufficient likelihood of success on the merits of these claims for petitioners to receive temporary injunctive relief:

> For purposes of the TRO. . . the Court finds that it would not be necessary in any way to intrude into foreign relations or negotiations over repatriation or transfer. The Court need only assess whether removing the detainees from the jurisdiction of the Court — while insisting on their continued detention — is subject to a temporary injunction so that the legality of that detention *ab inltio* can be determined and the trial judge can decide whether prior notice is appropriate. These issues are "'so serious, substantial, difficult and doubtful'" as to warrant maintaining the status quo "whether or not movant has shown a mathematical probability of success." (citation omitted).
>
> There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions. *Rasul,* 124 S. Ct. at 2698. There is also no doubt that "the All Writs Act, 28 U.S.C. § 1651(a), empowers a

10

district court to issue injunctions to protect its jurisdiction . . . ." *SEC* v. *Vision Communications, Inc.,* 74 F.3d 287, 291 (D.C. Cir. 1996).

*Abdah* Mem. Opinion at 6-7. Rejecting any argument that the District Court should refuse to issue a TRO while related detainee cases are pending before the Court of Appeals, Judge Collyer concluded:

> The Court expresses no opinion on the likelihood that Petitioners will succeed in their request for a 30-day notice prior to any transfer to a foreign country. Instead, it rules that the Petitioners have at least a fifty-fifty chance of prevailing on their constitutional claims before the Court of Appeals and that they raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, white insisting on continued detention, is within the province of the executive.

*Id* at 7. Especially where, as here, the risk of irreparable harm to Petitioner is so great, Judge Collyer's reasoning should control, and the Respondents should be temporarily restrained from transferring the Petitioner from Guantánamo.

### B. Petitioner Faces Substantial, Irreparable Harm If Immediate Injunctive Relief Is Not Granted

There can be no dispute that Petitioner faces substantial, irreparable harm if he is transferred to locations where he is likely to be tortured or subjected to cruel, inhuman or degrading treatment. Further irreparable harm may result if Petitioner is transferred for indefinite detention to countries where the Respondents hope that this Court will no longer have jurisdiction to decide Petitioner's pending habeas actions.[1]

---

[1] Judge Collyer found, for purposes of her March 12 decision in *Abdal,* that the transfer of detainees from Guantánamo may defeat habeas jurisdiction. Judge Collyer reasoned that if the petitioners were transferred to the control of a foreign country, they could effectively lose their rights to pursue their habeas claims in this country. The Court found that the petitioners' injury "would be continued detention outside the jurisdiction of U.S. courts, courts that are actively reviewing the constitutionality of that very detention." *Abdah* Mem. Op. at 7.

Judge Collyer has determined that the likely harm of transfer was so great to the Guantánatno detainees in *Abdah* that a TRO was warranted *regardless* of whether the threatened torture resulting from rendition actually occurred: "With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners." *Abdah* Mem. Op. at 8. Nevertheless, Judge Collyer went on to determine that the threat of immediate transfer is legitimate and worthy of temporary injunctive relief. Judge Collyer noted that "the Pentagon and the State Department are working together to arrange for some numbers of unspecified GTMO detainees to be transferred to foreign nations and detained for uncertain periods." *Abdah* Mem. Op. at 9. Because there is presently no way for anyone outside the chain of command in the U.S. Government to know when such a transfer is about to take place, "the Petitioners face a risk of irreparable harm that is sufficiently immediate to warrant temporary relief." *Id.*

### C. Issuing Immediate Injunctive Relief Satisfies a Strong Public Interest

Petitioner has a constitutionally-guaranteed right to judicial review of his detentions. *See Rasul,* 124 S. Ct. at 2698. Should the government wish to undermine that right by transferring Petitioner to a country which practices torture, Petitioner should, at the very least, be afforded an opportunity to be heard first. To permit the Executive Branch to continue with the actions that Petitioner now seeks to restrain would be to permit it to interfere unilaterally with that right. The public interest lies in "meticulous compliance with the law by public officials." *Fund for Animals, Inc.* v. *Espy,* 814 F. Supp. 142, 152 (D.D.C. 1993); *see also Fund for Animals, Inc.* v. *Clark,* 27 F. Supp.2d 8, 15 (D.D.C. 1998); U.S. Const., art. II (obliging the Executive to "take care that the Laws be faithfully executed").

Confidence that the United States stands for the "rule of law" has been shattered by the recent Abu Ghraib prison scandals and allegations of abuse in United States detention facilities around the world, all of which create the impression that the Respondents have created judicial "black holes" that allow them to avoid the application of their own laws, as well as normative international standards. *See Art-Metal USA* v. *Solomon,* 473 F. Supp. 1, 8 (D.D.C. 1978) ("[O]ur system of laws does not operate on the principle of the Queen in Alice in Wonderland 'Sentence first verdict afterwards.'"). No matter how satisfied the Executive Branch may be that its actions are lawful, the public good requires that federal litigants properly before the Court and represented by counsel be provided a meaningful opportunity to contest their transfer into the hands of those who might abuse them or detain them indefinitely without due process of law. Accordingly, the public interest favors the issuance of the temporary restraining order sought here.

### D. Granting Immediate Injunctive Relief Will Not Injure The Government's Interests

Finally, in stark contrast to the actual irreparable harm that Petitioner faces, there can be no injury to the Government where, as here, injunctive relief would merely temporarily maintain the status quo that the Government has created and enforced for the past three years. The only practical effect of a temporary restraining order would be to afford Petitioner a day in court to address the effect of a transfer from Guantánamo. As Judge Collyer determined:

> The Court can see no injury to the Government from granting a temporary injunction here. At most, this injunction will be alive for ten days unless both parties agree to its continuation or Judge Kennedy extends it another ten days. Nothing about this injunction will serve to prevent the Government's diplomatic and other efforts to arrange transfers of Guantãnamo Bay detainees but it will ensure that a judicial officer reviews the Petitioners' rights to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer.

13

*Abdah,* Mem. Op. at 9-10. Nothing about the Petitioner's circumstances warrants a different result in this case. Accordingly, the balance of equities favors the issuance of immediate injunctive relief preventing Respondents from removing Petitioner from Guantánamo without providing at least thirty (30) days' prior notice to the Court and counsel.

## CONCLUSION

For the reasons set forth above, Petitioner respectfully requests that this Court grant Petitioner's application for a temporary restraining order and preliminary injunction prohibiting Respondents from removing Petitioner from Guantánamo Bay Naval Base without thirty (30) days' advance notice to the Court and counsel.

Dated:   July 25, 2005

Respectfully submitted,

Counsel for Petitioner:

  /s/ Edmund Burke
Edmund Burke
BURKE MCPHEETERS BORDNER & ESTES
737 Bishop Street, Suite 3100
Honolulu, Hawaii  96813
Tel: (808) 523-9833
Fax: (808) 528-1656

Dated:    July 25, 2005

   /s/ Cary Silverman
-----

Carlos E. Provencio (D.C. Bar No. 461227)
Cary Silverman (D.C. Bar No. 473658)
SHOOK, HARDY & BACON L.L.P.
600 14th Street NW, Suite 800
Washington, D.C.  20005-2004

Tel: (202) 783-8400
Fax:  (202) 783-4211

Of Counsel for Petitioner:

Barbara Olshansky
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499