**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

OMAR MOHAMMED KHALIFH, et al.

      Petitioners,

    v.

GEORGE W. BUSH, et al.,

      Respondents.

Civil Action No. 05-CV-1189 (JR)

**RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONER'S MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Respondents hereby respond to petitioner Omar Mohammed Khalifh's motion for a

temporary restraining order and preliminary injunction requiring respondents to provide the

Court and petitioner's counsel with 30 days' advance notice of any intended transfer of petitioner

from the Guantanamo Bay Naval Base.[1]  While respondents recognize that this Court has issued

orders in other Guantanamo detainee habeas cases preventing "release, repatriation, or rendition"

of petitioners absent "further order of the Court[,]" see, e.g., Aziz v. Bush, Civ. A. No. 05-492

(JR) (D.D.C. April 20, 2005), respondents respectfully continue to oppose such relief in this case

---

[1] Some confusion exists as to the precise relief sought in petitioner's motion.  The title and focus of petitioner's memorandum in support the motion indicates that petitioner seeks an injunction that would require respondents to provide counsel for petitioner and the Court with 30 days' advance notice of any intended removal of petitioner from Guantanamo.  See Petitioner's Memorandum of Points and Authorities, at 1.  The motion itself, however, requests an injunction prohibiting respondents "from removing petitioner from Guantanamo Bay Naval Station, except for release."  See Petitioner Omar Mohammed Khalifh's Motion, at 1.  The proposed order submitted in support of the motion then asks the Court enjoin respondents "from removing petitioner from Guantanamo Bay Naval Base[,]" without any qualification for release.  See Proposed Order, at 1.  In any event, as demonstrated below, none of petitioner's requested remedies are warranted.

because petitioner has failed to establish a factual or legal basis for the relief sought.[2]

## BACKGROUND

### A.    Detention of Enemy Combatants at Guantanamo

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States captured or took

custody of a number of enemy combatants, some of whom are being held at the Guantanamo Bay

Naval Base ("Guantanamo") in Cuba.

### B.    Repatriation and Transfer of Detainees at Guantanamo

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining enemy combatants

---

[2] Similar motions have been filed over the past three months in numerous other Guantanamo detainee habeas cases, with varying outcomes.  Compare, e.g., Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005) (granting preliminary injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers other than for release), with Al-Oshan v. Bush, Civ. A. No. 05-520 (RMU) (D.D.C. Mar. 31, 2005) (ordering advance notice as part of stay), with Aziz v. Bush, Civ. A. No. 05-492 (JR) (D.D.C. April 20, 2005) (denying preliminary injunction but ordering that stay of proceedings "will apply to all proceedings applicable to the petitioners, including without limitation their release, repatriation, or rendition"), with Deghayes v. Bush, Civ. A. No. 04-2215 (RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court of any decision to transfer a particular individual to a particular country), with Almurbati v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. Apr. 21, 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op. (D.D.C. May 2, 2005) (same).

Respondents have taken interlocutory appeals of the orders requiring advance notice.

longer than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee

Affairs Matthew C. Waxman dated June 2, 2005, attached as Exhibit A ("Waxman Decl.") ¶ 3;

Declaration of Ambassador Pierre-Richard Prosper dated March 8, 2005, attached as Exhibit B

("Prosper Decl.") ¶ 2.[3]  Each detainee's status as an enemy combatant is reviewed by military

tribunals, known as Combatant Status Review Tribunals ("CSRTs"), convened for that purpose.

During the CSRT proceedings, the detainees are provided with notice of the factual basis for

their classification as enemy combatants, they are allowed to present evidence on their own

behalf, and the tribunal members then make an independent determination as to whether the

detainees should continue to be designated as enemy combatants.  Those who are not so

designated have been and will be released.  See July 7, 2004 Order Establishing Combatant

Status Review Tribunal, available online at

http://www.defenselink.mil/news/Jul2004/d20040707review.pdf; July 29, 2004 Memorandum

regarding Implementation of Combatant Status Review Tribunal Procedures for Enemy

Combatants Detained at Guantanamo Bay Naval Base, Cuba, available online at

http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

    The Department of Defense ("DoD") also conducts at least annual reviews of each enemy

combatant Guantanamo detainee to determine whether continued detention is warranted based on

factors such as whether the detainee continues to pose a threat to the United States and its allies.

Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those annual reviews include those currently being

---

[3] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two
prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar
motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration
submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ.
A. No. 04-1254 (HHK), but is equally applicable to the instant case.

conducted through Administrative Review Boards.  See Waxman Decl. ¶¶ 3, 7.[4]  As part of the

Administrative Review Board process, counsel who represent detainees have been invited to

make written submissions concerning whether further detention is appropriate; in these

submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or

repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official

grants the ultimate approval for the transfer of any Guantanamo detainee to the control of

another government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Over 200 Guantanamo

detainees have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4;

Prosper Decl. ¶ 2.[5]

Where continued detention by the United States is not warranted, a detainee may be

transferred to the control of another government, typically the government of his country of

citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers

Guantanamo detainees, under appropriate circumstances, to the control of other governments for

---

[4]  See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, available at http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf; Memorandum dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf.

[5]  As an update to certain information provided in the attached declarations, at last count, 242 detainees have been transferred by the Defense Department from Guantanamo, of which 174 were transferred for release and 68 were transferred to the control of other governments for those governments' own law enforcement purposes.  See Department of Defense Press Release, "Detainee Transfer Announced," July 20, 2005, at http://www.dod.mil/releases/2005/nr200050720-4122.html.

continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. Id. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. Id. In fact, most of the Guantanamo detainees who have been transferred by the Department of Defense to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, whether for release or for continued detention, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its

international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7.  It is the policy of the United

States not to repatriate or transfer a detainee to a country where the United States believes it is

more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.

If a transfer is deemed appropriate, a process is undertaken, typically involving the Department

of State, in which appropriate assurances regarding the detainee's treatment are sought from the

country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.

Once the Department of Defense approves a transfer and requests the assistance of the

Department of State, the Department of State initiates transfer discussions with the foreign

government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an

effort to seek assurances that the United States Government considers necessary and appropriate

for the country in question, including assurances of humane treatment and treatment in

accordance with the international obligations of the foreign government accepting transfer.  Id.

Among other things, the Department of State considers whether the nation in question is a party

to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or

Degrading Treatment or Punishment, and pursues more specific assurances if the nation

concerned is not a party or other circumstances warrant.  Id.

        The determination whether it is more likely than not an individual would be tortured by a

receiving foreign government, including, where applicable, evaluation of foreign government

assurances, involves senior level officials and takes into account a number of considerations,

including whether the nation concerned is a party to certain treaties; the expressed commitments

of officials of the foreign government accepting transfer; the particular circumstances of the

transfer, the country, and the individual concerned; and any concerns regarding torture that may

arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are developed through a process involving the Bureau of Democracy, Human Rights, and Labor (which drafts the State Department's annual Country Reports on Human Rights Practices) and the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl. ¶ 7.[6]  When evaluating the adequacy of assurances, State Department officials consider the identity, position, or other information concerning the official relaying the assurances; political or legal developments in the foreign country concerned that provide context for the assurances; and the foreign government's incentives and capacity to fulfill its assurances to the United States.  Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which the assurances obtained from the receiving government were not sufficient when balanced against treatment concerns, the United States would not transfer a detainee to the control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where the Department of Defense decided not to transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7; Prosper Decl. ¶ 8.

---

[6] It is important to note that the Country Reports on Human Rights Practices are relevant but not necessarily dispositive in assessing whether it is more likely than not that a particular individual will be tortured by a receiving foreign government.  It should be borne in mind that, for example, the Country Reports may describe problems that are confined to a particular facility or component of a government, may reflect certain types of fact patterns that are not applicable to the situation at hand, or may raise concerns that can be appropriately addressed through assurances deemed acceptable by the United States from the receiving government and, in appropriate cases, monitoring mechanisms.  Thus, the fact that a Country Report on Human Rights Practices discusses issues with respect to a country does not per se make that country forever off limits as a potential repatriation or transfer destination.

The United States' ability to seek and obtain assurances from a foreign government depends on its ability to treat its dealings with the foreign government with discretion. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. Obviously, diplomatic sensitivities surround the Department of State's communications with foreign governments concerning allegations relating to torture. Prosper Decl. ¶ 9; Waxman Decl. ¶ 8. The United States Government typically does not unilaterally make public any specific assurances or other precautionary measures obtained, because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations. Prosper Decl. ¶ 9. If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[7] Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8. As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism. Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

## I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary

---

[7] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker. Prosper Decl. ¶ 11. Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials. Id.

and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries

the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton,

391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a

movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he]

would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not

substantially injure other interested parties, and 4) that the public interest would be furthered by

the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction

"must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief will not be granted against

something merely feared as liable to occur at some indefinite time; the party seeking injunctive

relief must show that the injury complained of is of such imminence that there is a clear and

present need for equitable relief to prevent irreparable harm." Id. (citations and internal

quotation marks omitted; emphasis in original).

Some Judges of this Court have entered the functional equivalent of preliminary

injunctive relief as a component of the stay of proceedings that respondents have requested

pending related appeals. As Judge Bates concluded, however, "if the petitioners cannot meet the

prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that

same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing

Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at

*1 (D.D.C. Dec. 23, 1988)). Thus, in whatever form of order the inherently-injunctive-in-nature

relief petitioner seeks might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.

## II.    PETITIONER FAILS TO SHOW IRREPARABLE INJURY.

### A.    Speculation that the United States Will Defy its Own Policy by Transferring Detainees to Countries in Circumstances Where it is Believed They Will be Tortured Does Not Warrant a Preliminary Injunction.

Petitioner has not offered sufficient competent evidence to satisfy his burden of demonstrating that he will suffer irreparable injury that is "certain and great . . . actual and not theoretical." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). Petitioner relies on mere generalizations about the political and prison climate in various countries and alleges, without any factual support, that he is likely to suffer mistreatment if transferred to those countries. See Petitioner's Memorandum of Points and Authorities, at 4-6, 11-12. Specifically, petitioner states that he is a Libyan national and argues, without support, that transfer to certain countries, such as Libya, Saudi Arabia, or Egypt, will subject him to considerable risk of torture. However, there is no evidence of direct harm, much less imminent harm, to support the extraordinary injunctive relief sought by petitioner.

Petitioner also refers to sensationalistic press reports charging that the U.S. Government has rendered detainees into the custody of foreign governments that engage in torture. Id. at 3-4.[8] Indeed, petitioner's motion is rife with unsubstantiated speculation that, contrary to the

---

[8] Petitioner fails to note that none of the news stories pertain to the transfer or repatriation of Guantanamo detainees. Moreover, petitioner's reference to an alleged "rendition" of Mamdouh Habib to Egypt is unavailing. See Petitioner's Memorandum of Points and Authorities at 4-5. Petitioner ignores the fact that the alleged incident occurred before Mr. Habib became a Guantanamo detainee. After arriving at Guantanamo, Mr. Habib was detained there

(continued...)

policies and processes attested to in the sworn declarations of high-level Executive Branch officials, the United States has designs to send him to a country in circumstances where he will be tortured. Those declarations, after all, make clear that it is the policy of the United States not to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. This policy is implemented through a process that contains several levels of precautions and safeguards. To conclude that an injunction is nevertheless necessary would require the Court to assume, without any evidence, that the United States' policy and practice is somehow a sham or pretext. There is no valid basis for such an assumption.

Rather, as Judge Walton has found, respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit." Almurbati, 366 F. Supp. 2d at 78. Moreover, Judge Bates found that the assortment of magazine and newspaper stories relied upon by many detainee-petitioners in these cases failed to form a factual predicate justifying an injunction, noting that, among other problems with relying on such materials, "[p]etitioners [in that case] concede that none of these incidents involve the transfer of detainees out of Guantanamo." Al-Anazi, 370 F. Supp. 2d at 190-91; see also id. at 196. Thus, petitioner has failed to show that either the prospect of relinquishment from United States custody or unfounded speculation about

---

[8](...continued)
for several years and then transferred to his home country, Australia, in January 2005. See Dep't of Defense Press Release (Jan. 28, 2005) (available at www.defenselink.mil/releases/2005/nr20050128-2028.html); Petition for Writ of Habeas Corpus, filed in Habib v. Bush, No. 02-CV-1130 (CKK) (June 10, 2002).

possible torture in a foreign country constitute irreparable harm that must be remedied by a preliminary injunction.

> **B.    The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction.**

Petitioner also incorrectly contends that advance notice of any transfer through a preliminary injunction is needed to protect or preserve the Court's jurisdiction to decide the merits of petitioner's pending habeas petition. See Petitioner's Memorandum of Points and Authorities, at 9-11. This argument rests on faulty logic. The primary relief sought by petitioner is release from custody. Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[9] "The ultimate objective of a habeas petition is release from custody." Almurbati, 366 F. Supp. 2d at 78. As Judge Walton found, "once the respondents release the petitioners from United States custody . . . they will have obtained the

---

[9] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court. Waxman Decl. ¶ 3. Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court. Waxman Decl. ¶ 4. As Judge Bates noted, 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts." Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 4 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of this and most other detainee habeas petitions).

result requested and at that point there will be no further need for this Court to maintain jurisdiction." Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners." (citation omitted)).

That release from United States custody will give petitioner all the relief he can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, a former detainee may be taken into custody and detained in the receiving country based on that country's independent interests and determinations. As respondents' declarations make clear, when the Department of Defense transfers detainees to the control of other governments, the detainees are no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's independent decision, based on its domestic laws, that the individual should be detained. Waxman Decl. ¶ 5. Indeed, even if the United States transfers a detainee to his home government with the understanding that, from the United States' perspective he can be released, the home government may well subsequently take any law enforcement or investigatory action against the former detainee that it may deem appropriate under its laws. The Court should therefore reject petitioner's suggestion that the possibility of future detention in an individual's home or another country based on that country's independent interests and determinations constitutes irreparable injury warranting an injunction.[10]

---

[10] In ordering advance notice, some Judges of this Court have relied upon the decision in Abu Ali v. Ashcroft, 350 F. Supp. 2d 28 (D.D.C. 2004), as illustrating that a transfer could

(continued...)

III.    **PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS
        IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
        IN ACCORDANCE WITH THE POLICIES EXPRESSED IN
        RESPONDENTS' DECLARATIONS.**

Petitioner fares no better on the second prong of the preliminary injunction analysis,

which requires him to show that he is likely to succeed, following notice, in preventing any

transfer from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the

ongoing appeals in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005), appeals docketed, Nos.

05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and In re Guantanamo Detainee Cases, 355 F. Supp.

2d 443 (D.D.C. 2005), appeal on petition for interlocutory appeal, No. 05-5064 et al. (D.C. Cir.),

and of petitioner's habeas claim that he is being wrongfully detained, it is not the likelihood of

success on those issues or claims that matters for purposes of the instant motion for preliminary

injunction.  Instead, as two Judges of this Court (who reached opposite outcomes on the motion)

have agreed, the likelihood of success analysis must focus on the legal basis for petitioner to

obtain an order preventing termination of detention by the United States in the manner described

in the declarations submitted herewith.  See Al-Anazi, 370 F. Supp. 2d at 194 ("[T]he presence

_____

[10](...continued)
hypothetically result in some type of "constructive custody" situation.  However, the declarations
submitted herewith make clear that any transfer to a foreign government is a complete transfer in
which the United States relinquishes custody entirely, refuting the notion of a "constructive
custody" relationship.  For that reason as well as several other important distinctions, the author
of the Abu Ali decision described it as "not particularly instructive" in the context of these
Guantanamo detainee motions seeking advance notice of transfers.  Al-Anazi, 370 F. Supp. 2d at
197 n.9.  Furthermore, petitioner offers no factual basis, just repeated supposition and innuendo,
see Petitioner's Memorandum of Points and Authorities at 3-6, that the United States has a
policy or practice of transferring Guantanamo detainees to other U.S. facilities overseas for
continued detention by the United States.

14

of a sound basis to challenge the legality of one's <u>detention</u> does not at all imply that there exists

a sound basis to challenge the legality of one's <u>transfer</u>. Put differently, the "merits," if you will,

to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners'

challenge to their <u>transfer</u> from Guantanamo, not to their <u>detention</u> at Guantanamo." (emphasis

in original)); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u> there are no circumstances under which

Petitioners could obtain a court order preventing a contemplated transfer, a preliminary

injunction should not be granted" (emphasis in original)).

      Petitioner has not identified any valid source of legal authority for such an order. And

even if some legal basis for challenging a transfer existed, the Rule of Non-Inquiry, which bars

judicial inquiry into the fairness of a foreign nation's justice system and the procedures or

treatment that an individual may experience in a foreign nation, weighs heavily against

petitioner's likelihood of success in contesting a transfer or repatriation.

      **A.**    **No Valid Legal Basis Exists for a Judicial Order**
                **Enjoining Transfer or Repatriation of an Individual**
                **Previously Detained by the United States as an Enemy Combatant.**

      Petitioner fails to offer a viable legal theory under which the Court could somehow be

authorized to enjoin the Executive's determination to transfer him from Guantanamo. First,

petitioner's reliance on <u>Rasul v. Bush</u>, 124 S. Ct. 2686 (2004), is misplaced. The D.C. Circuit

recently explained in <u>Hamdan v. Rumsfeld</u>, — F.3d —, 2005 WL 1653046, at *5 (D.C. Cir. July

15, 2005), that <u>Rasul</u> decided only a "'narrow' question: whether federal courts have jurisdiction

under 28 U.S.C. § 2241 'to consider challenges to the legality of the detention of foreign

nationals at Guantanamo Bay.'" Id. (quoting <u>Rasul</u>, 124 S. Ct. at 2690). As explained above,

jurisdiction to consider the legality of petitioner's detention is entirely distinct from a substantive

legal basis to challenge the legality of one's transfer.

Second, petitioner incorrectly claims that various international treaties, such as the Geneva Conventions, the International Covenant on Civil and Political Rights ("ICCPR"), and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT"), support the requested relief. Such claims are not valid and would not provide a basis for finding a likelihood of success in obtaining an order barring a transfer or repatriation.

In Hamdan, the D.C. Circuit squarely held that "the 1949 Geneva Convention does not confer . . . a right to enforce its provisions in court." Hamdan, 2005 WL 1653046, at *6. Similarly, numerous other courts have held that neither the ICCPR nor the CAT give rise to judicially enforceable rights. See, e.g., Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2767 (2004) (ICCPR); In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 480 (D.D.C. 2005) (ICCPR); Khalid v. Bush, 355 F. Supp. 2d 311, 327 (D.D.C. 2005) (ICCPR and CAT); see also Al-Anazi, 370 F. Supp. 2d at 194 (rejecting petitioners' argument that Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts, could serve as legal basis for prohibiting or limiting transfer of wartime detainees to other countries). In any event, neither this petitioner nor any others have identified any provision in any treaty that is in conflict with the United States' policy governing transfers and repatriations of individuals detained at Guantanamo by the Department of Defense, or that would be violated by a transfer or repatriation undertaken in accordance with that policy.

**B.**            **Separation-of-Powers Principles Militate Heavily Against
                  Petitioner's Likelihood of Success**.

Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an

advance notice requirement to support and facilitate such involvement, the separation of powers

would bar such relief. "[I]t is beyond the judicial function for a court to review foreign policy

decisions of the Executive Branch." People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23

(D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333

U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations

such as this, '[t]he controlling considerations are the interacting interests of the United States and

of foreign countries, and in assessing them [the courts] must move with the circumspection

appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our

international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S.

354, 383 (1959));[11] Schneider v. Kissinger, ___ F.3d ___, No. 01-01902, 2005 WL 1513083, at

**3, 4, 6 (D.C. Cir. June 28, 2005) ("[T]here [can] be no doubt that decision-making in the fields

of foreign policy and national security is textually committed [by Articles I and II] to the

political branches of government," while Article III, on the other hand, "provides no authority

for policymaking in the realm of foreign relations or the provision of national security."). If the

---

[11] In Holmes, U.S. citizen servicemembers sued to prevent the United States Government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."
459 F.2d at 1225.

Court were to entertain petitioner's claim to a right to contest his repatriation or removal from Guantanamo to an undesired country, it would insert itself into the most sensitive of diplomatic matters. Judicial review of a transfer or repatriation decision could involve scrutiny of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein.[12] Prosper Decl. ¶¶ 9-12. Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments. Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8. In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns. Prosper Decl. ¶¶ 10, 12. This chilling effect would jeopardize the cooperation of other nations in the war on terrorism. Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir.

---

[12] It is important to understand that even if the United States determines that a detainee may be released, such a release in this context is not a matter of simply letting the detainee walk out through the front gates of the detention facility. Because the Guantanamo detainees are foreign nationals, release necessarily means repatriating them to their home country or transferring them to another suitable country, which requires, among other things, diplomatic coordination with the foreign government, implementation of respondents' policies to guard against transfers of detainees to countries where they are likely to be mistreated, and arrangements for intercontinental transportation – all functions of the Executive Branch.

18

1997) (quoting <u>Arnbjornsdottir-Mendler v. United States</u>, 721 F.2d 679, 683 (9th Cir. 1983));

<u>see</u> <u>Al-Anazi</u>, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the

extradition context" "counsel[s] even further against judicial interference").  This principle is

sometimes called the Rule of Non-Inquiry.  For example, in <u>Ahmad v. Wigen</u>, 910 F.2d 1063 (2d

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial

for an alleged terrorist attack.  While the district court upheld the extradition only after receiving

testimony and extensive documentation concerning Israel's law enforcement system and

treatment of prisoners, the Second Circuit held that such inquiry was wholly improper.  "The

interests of international comity are ill-served," the Second Circuit explained, "by requiring a

foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its

laws and the manner in which they are enforced.  <u>Id.</u> at 1067.  "It is the function of the

Secretary of State to determine whether extradition should be denied on humanitarian grounds."

<u>Id.</u>  Accord <u>Escobedo v. United States</u>, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar

extradition based on allegations that appellant "may be tortured or killed if surrendered to

Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that

properly falls within the exclusive purview of the executive branch" (internal quotation marks

omitted)); <u>Peroff v. Hylton</u>, 563 F.2d 1099, 1102 (4th Cir. 1977); <u>Matter of Extradition of</u>

<u>Sandhu</u>, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); <u>Hoxha v. Levi</u>, No. Civ. A. 05-1211, 2005

WL 1244913, at *6-*7 (E.D. Pa. May 25, 2005) (holding that allegations that individual would

be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an

appropriate subject for judicial inquiry).  <u>See generally</u> Jacques Semmelman, <u>Federal Courts, the</u>

<u>Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings</u>, 76 Cornell

L. Rev. 1198 (1991).[13]

The force of these principles is not diminished by the fact that petitioner seeks judicial review of any kind of transfer, repatriation or removal from Guantanamo other than for purposes of release, rather than merely trying to block an extradition.  The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[14]  See Matter of Requested Extradition of Smyth, 61 F.3d

_____

[13] In Cornejo-Barreto v. Seifert, 218 F.3d 1004 (9th Cir. 2000), two Judges on a panel of the Ninth Circuit stated in dicta that a permanent resident within the United States facing extradition could seek judicial review of his claim that he would be tortured if extradited.  But see id. at 1017 (Kozinski, J., concurring) (not joining this part of the panel opinion).  However, in a later appeal growing out of the same case, another panel of the Ninth Circuit disagreed with that statement, recognizing it as dicta, and held, consistent with previous Ninth Circuit precedent, Lopez-Smith v. Hood, 121 F.3d 1322 (9th Cir. 1997), that the Rule of Non-Inquiry barred judicial review of such a claim.  Cornejo-Barreto v. Seifert, 379 F.3d 1057 (9th Cir. 2004).  While that appeal was still pending (the Ninth Circuit having granted rehearing en banc), the case became moot when the foreign government seeking extradition withdrew its request.  Accordingly, the Ninth Circuit dismissed the appeal, vacating as moot the 2004 panel opinion and the district court opinion it reviewed.  Cornejo-Barreto v. Seifert, 389 F.3d 1307 (9th Cir. 2004).

[14] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision.  Kin-Hong, 110 F.3d at 111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance.  See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner might contend that the only possible way to repatriate him would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v.

(continued...)

711, 714 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioner cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country as well as the credibility and adequacy of a foreign government's assurances. Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'" (quoting Chicago & Southern, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming transfer or repatriation in order to enable petitioner to seek a judicial order blocking it. And, apart from the absence of affirmative legal authority, separation of powers considerations and

---

[14](...continued)
Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, at *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its

judgment regarding the appropriateness of repatriation for that of the appropriate Executive

Branch officials.

**IV.     AN INJUNCTION REQUIRING ADVANCE NOTICE
         WOULD TRAMPLE ON THE SEPARATION OF POWERS**.

It is undisputed that the sole reason petitioner seeks advance notice is to enable him to

seek an order blocking a transfer or repatriation decision that the Executive would already have

made after consultation and coordination with the foreign government in question.  Such an

advance notice requirement foreshadows judicial review and intervention that would be

accompanied by the attendant harms discussed in the declarations of Deputy Assistant Secretary

Waxman and Ambassador Prosper submitted herewith.  See Waxman Decl. ¶ 8; Prosper Decl. ¶¶

10, 12.  Even if such judicial review did not ultimately result in an injunction against transfer, the

mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer

and any assurances that may have been obtained would cause grave harm.  See supra Section

III.B (describing interests of international comity that underlie the Rule of Non-Inquiry);

Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12.  Moreover, the very prospect of judicial review, as

exemplified by an advance notice requirement, causes separation-of-powers harm by

undermining the ability of the Executive Branch to speak with one voice in its dealings with

foreign nations.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000)

(expressing disapproval of acts that "compromise the very capacity of the President to speak for

the nation with one voice in dealing with other governments").  An advance notice requirement,

after all, would make the results of diplomatic dialogue between the Executive Branch and a

foreign government regarding repatriations or transfers inherently contingent because the

22

effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers. These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST.

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.  Although petitioner may invoke truisms such as the public interest disfavors torture, that aspect of the public interest is already well served by the existing policies and processes governing transfers and repatriations of Guantanamo detainees, as described in the accompanying declarations.[15]  As Judge Bates held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

---

[15] Similarly, while two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G&V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Marri, 2005 WL 774847, at *6; Abdah, 2005 WL 711814, at *6, that formulation merely begs the question: what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid v. Bush, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005)), are present or imminent here and stand to be prevented by an injunction?  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioner may have, constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion for a temporary restraining order and preliminary injunction be denied in all respects.


Dated: August 1, 2005                    Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        KENNETH L. WAINSTEIN
                                        United States Attorney

                                        DOUGLAS N. LETTER
                                        Terrorism Litigation Counsel

                                            /s/ Andrew I. Warden
                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        TERRY M. HENRY
                                        JAMES J. SCHWARTZ
                                        PREEYA M. NORONHA
                                        ROBERT J. KATERBERG
                                        ANDREW I. WARDEN (IN Bar No. 23840-49)
                                        NICHOLAS J. PATTERSON
                                        EDWARD H. WHITE

                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave., N.W.
                                        Washington, DC  20530
                                        Tel:  (202) 514-4107
                                        Fax:  (202) 616-8470

                                        Attorneys for Respondents