FILED WITH THE
COURT SECURITY OFFICER
CSO: [signature]
DATE: 5/28/10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OMAR MOHAMMED KHALIFH

    Petitioner,

    v.

BARACK H. OBAMA, et al.,

    Respondents.

Civil Action No. 05-CV-1189

## MEMORANDUM ORDER

Omar Mohammed Khalifh (ISN 695), a Libyan national, alleges that he is illegally detained at Guantanamo Bay Naval Base and petitions this court for a writ of *habeas corpus* to secure his release. Petitioner has filed a traverse and an amended traverse, and the government has moved for judgment on the record. For the reasons that follow, the government's motion will be granted, and the petition for a writ of habeas corpus will be denied.[1]

### Background

Khalifh lost his right leg below the knee in 1998 or 1999 and received a prosthetic limb in mid-2001 from the International Committee for the Red Cross Kabul Orthopaedic Centre. J.E. 13. He was captured by Pakistani forces in

---

[1] Petitioner's counsel Cary Silverman and Edmund Burke have represented their client zealously and well, providing indepsensible service not only to their client, but also to the court, *pro bono publico*, in the highest tradition of the bar. Mr. Burke, in particular, traveled all the way from his home in Hawaii to GTMO and back many times. My thanks to both of them.

1

Jalalabad, Pakistan, in March 2002 and subsequently transferred to U.S. custody. He filed this petition in 2005, but his case, like all other habeas corpus petitions from Guantanamo Bay, was put on hold until the Supreme Court decided that Guantanamo detainees have a right to habeas proceedings and that this court has jurisdiction to hear them. Boumediene v. Bush, 128 S.Ct. 2229 (2008). With Judge Hogan's omnibus Case Management Order as a guide, I held a merits hearing on April 19 and 20, 2010. Although he was given the option to do so, Khalifh did not testify or listen to the proceedings remotely. I announced my decision from the bench following the hearing, and now issue this opinion to make a full record of my reasoning.

### I. Legal Standards

The government's authority to detain Khalifh, if any, derives from the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-04, 115 Stat. 224 (2001). The court of appeals has held that the President's authority pursuant to the AUMF at least includes, but is not necessarily limited to, detention of "those who are part of forces associated with Al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners." Al-Bihani v. Obama, 590 F.3d 866, 872 (D.C. Cir. 2010). The government

2

contends that Khalifh was a part of al-Qaida, the Taliban, and associated forces, justifying his detention. The government had the burden of proving the lawfulness of the detention by a preponderance of the evidence. In re Guantanamo Bay Detainee Litig., Misc. No. 08-442, CMO § II (A); Awad, 646 F. Supp. 2d at 23-24; see also Al-Bihani, 590 F.3d at 878 (upholding the constitutionality of the preponderance standard).

A. "Part of"

The test now applied by most judges of this court for determining who is or was "part of" al-Qaida was first articulated by Judge Bates: "whether the individual functions or participates within or under the command structure of the organization - i.e., whether he receives and executes orders or directions." Hamlily v. Obama, 616 F. Supp. 2d 63, 75 (D.D.C. 2009); see also Awad v. Obama, 646 F. Supp. 2d 20, 23 (D.D.C. 2009)(appeal pending). A detainee may fit within or under al-Qaida's "command structure" even if he never actually fights for al-Qaida. Al-Bihani, 590 F.3d at 872. Detention is lawful under the "part of" prong if the detainee has received and executed al-Qaida's orders, even if he has only been a cook in an al-Qaida camp. Id.; accord Gherebi v. Obama, 609 F. Supp. 2d 43, 69, n. 19 (D.D.C. 2009).

B. Temporal Issue

Khalifh does not concede that he was ever a member of al-Qaida, the Taliban, or associated forces, see J.E. 13; but he argues in the alternative that even if I find that he was once a member of a detainable organization, his membership had lapsed by the time of his capture. The government must show that detention was lawful at the time of capture. See Salahi v. Obama, 2010 U.S. Dist. LEXIS 35360, at *8-9 (D.D.C. Apr. 9, 2010) (appeal pending); Gherebi, 609 F. Supp. 2d. at 71. The government need not show an affirmative act after 9/11, but to justify detention it must show that the petitioner was a part of al-Qaida, the Taliban, or related forces at the time of his capture. See Salahi, 2010 U.S. Dist. LEXIS 35360, at *9-10. A petitioner who may once have been part of al-Qaida or the Taliban can show that he was no longer part of such an entity at the time of capture by showing that he took affirmative actions to abandon his membership. See, e.g., Al Ginco v. Obama, 626 F. Supp. 2d 123, 128-30 (D.D.C. 2009); Hatim v. Obama, 2009 WL 5191429, at *10, 12 (D.D.C. Dec. 15, 2009). In Salahi, I held that a petitioner could also show lapse of membership even without an affirmative act of severance, if the evidence that the membership had

4

lapsed is "credible and significant." Salahi, U.S. Dist. LEXIS 35360, at *10-11. That proposition, however (from which an appeal is pending) rests on unusual facts: in Salahi's case there was a gap of nearly a decade between his activity in al-Qaida and his subsequent capture. Id. at *15-35.

## C. Hearsay

Hearsay, along with other evidence normally excluded by the Federal Rules of Evidence, is admissible in these proceedings. See Al-Bihani, 590 F.3d at 879-81. All proffered evidence has been admitted and given the weight it deserves. See Awad, 646 F. Supp. 2d at 23.

## D. Coerced Statements

Khalifh alleges that he was mistreated during detention between "late 2004" and "early 2005," see J.E. 13 addendum, so he argues that the court should disregard his statements during interrogation from that period. Specifically, Khalifh alleges that during that period he suffered painful glaucoma that was not sufficiently treated, was kept in an extremely cold cell that caused pain in the metal rods in his leg, █████████████████
████████████████████████████████████ and was denied use of his prosthetic leg. The government denies mistreating Khalifh. Proof of mistreatment can

5

taint a petitioner's statements, raising questions about their reliability. See, e.g., Mohammed v. Obama, 2009 WL 4884194, * 24-27 (D.D.C. Dec. 16, 2009); Al Rabiah v. United States, 2009 WL 3083077, *21 (D.D.C. Sept. 17, 2009) (citing U.S. v. Karake, 443 F. Supp. 2d 8, 87-88 (D.D.C. 2006)). Here, I need not resolve whether Khalifh was mistreated from late 2004 to early 2005 (which I will refer to as the "window of alleged mistreatment" or the "window period"), because, as I shall discuss, none of the statements from the window period are necessary for the government to prove its case *in toto*. Where window-period statements are the sole or principal evidence supporting a particular government assertion, I find them unconvincing for reasons independent of the alleged mistreatment.

## II. The Evidence
### A. 1992-1996: Libya and Sudan

The details of Khalifh's time in Libya and Sudan are largely undisputed. While living in Libya, his native country, Khalifh affiliated himself in 1992 at the age of 20 with the Libyan Islamic Fighting Group ("LIFG"). J.E. 95. He remained active with the LIFG in Libya for three years. Id. The LIFG was an organization opposed to Libyan dictator Mummar al-Qaddafi, which slowly split into a faction that supported international terrorist networks and

6

faction that was strictly Libya-focused and anti-Qaddafi.[2] J.E. 186. As a participant in the LIFG, Khalifh assisted its members with obtaining weapons, housing, vehicles, and intelligence. J.E. 30. He fled to Sudan in 1995 because he learned that the Libyan government was investigating his activities with the LIFG and intended to question him. J.E. 30, 91.

In Sudan, Khalifh lived in LIFG-owned houses, J.E. 38, and worked for a trucking company owned by Osama bin Laden. J.E. 30, 48, 50. During this time, he severely injured his left leg while attempting to climb over a wall at a guesthouse, resulting in numerous large scars on his lower leg. J.E. 13, 19, 50, 91. While in Sudan, he also received a significant amount of training in the use of explosives, as well as training in firearms, topography, and ambush.[3] J.E. 38 (window period), 41 (window period), 50, 52, 91. The record is clear that Khalifh became an expert in explosive devices and remained enthusiastic about discussing, studying, and teaching the mechanics of their

---

[2] The U.S. designated the LIFG a terrorist group in 2004, and it merged with al-Qaida in 2007. J.E. 4, 186. The exact timing and nature of LIFG's development from an anti-Qaddafi entity into a broader terrorist group is murky and disputed by the parties.

[3] There is conflicting evidence as to whether Khalifh swore *bayat*, or an oath of loyalty, to the LIFG while in Libya. Compare J.E. 91 (Khalifh stated that he was part of a group that swore bayat), with J.E. 30 (Khalifh denied such an oath). Resolving this factual dispute is unimportant, given the extensive evidence of Khalifh's participation and travels with the LIFG.

7

use. See J.E. 38 (window period), 41 (window period) (noting that "the detainee is excited for the next [interrogation] session where we could talk [more] about explosives"), 52. In 1996, due to political pressure, bin Laden and many of his followers left Sudan for Afghanistan. J.E. 188. However, Khalifh was not permitted to leave for Afghanistan with bin Laden's retinue, but left for Afghanistan around a number of months later on direct orders from LIFG emir Sadeq.[4] J.E. 38 (window period), 48, 91.[5]

In sum, the largely undisputed record shows that Khalifh associated extensively with the LIFG during his time in Libya and Sudan, and that, when he was in Sudan, his participation with the LIFG developed into involvement with al-Qaeda and bin Laden associates. In his declaration Khalifh denies ever having been a member of the LIFG, see J.E. 13, but his admission to following a direct order from the LIFG to leave Sudan for Afghanistan shows that he was at least a "part of" the LIFG.

---

[4] In his declaration, Khalifh indicated that he went to Pakistan for a time between leaving Libya and going to Afghanistan, see J.E. 13, but the bulk of the evidence contradicts that claim, and at the merits hearing his counsel did not advance that position. As shall be seen, numerous statements in Khalifh's declaration and supplemental declaration (J.E. 13 & addendum) are contradicted by the most reliable evidence, and I find their probative value to be limited.

[5] It appears likely that petitioner's departure occurred in 1996, but the record is not entirely clear. See J.E. 48.

8

B. 1996-1998: Training Camps in Afghanistan

After relocating to Afghanistan, Khalifh resided there (with possible short departures) until leaving for Pakistan sometime in 2001 or 2002. It is undisputed that he worked at the Jihad Wahl training camp in Afghanistan. J.E. 173, 174. Jihad Wahl was a paramilitary training facility run by Osama bin Laden. J.E. 6. Khalifh described Jihad Wahl as a training camp focused on specialized skills and advanced tactics, which worked in tandem with bin Laden's basic training camp at Al-Faruq. J.E. 55.

The bulk of the evidence indicates that Khalifh arrived at Jihad Wahl in 1996. See J.E. 35 (window period), 52, 92. While at Jihad Wahl, he worked as an explosives trainer, received additional training in guerrilla tactics, repaired vehicles, constructed props for al-Qaida training videos, commanded a guard post, and moved equipment as needed. J.E. 52, 54, 55, 57, 92. Of note, Khalifh described himself as following an order from Abu Atta, a training camp leader, to build props to assist in filming a recruiting video. J.E. 52. Later, likely in 1998, Khalifh became an explosives trainer at the al-Faruq basic training camp. J.E. 54, 57; see also J.E. 6 (describing al-Faruq in detail).

9

Petitioner resists the idea that Jihad Wahl and al-Faruq should be labeled "al-Qaida" training camps, but concedes that the camps were run by bin Laden and that they trained people in guerrilla and terrorist methods. Khalifh indeed argues that his presence at these camps does not prove that he was a member of al-Qaida because more than 10,000 individuals passed through them. But Khalifh was not just passing through; he participated extensively in these camps, as a trainer and in a low-level leadership position. He certainly was "part of" al-Qaida during this period.

C. 1998-Sept. 11, 2001: Loss of Leg and Safe Houses

In his declaration, Khalifh states that he lost his right leg in 1998 or 1999 when he stepped on a landmine. J.E. 13. It is undisputed that for a week in 1998, he had worked with the Taliban as a "minesweeper" or sapper.[6] See Merits H'g Tr. 176-77. It is fairly easy to connect the two undisputed facts, and indeed most of the evidence shows that he lost his leg by triggering a mine while working for the Taliban. He told his U.S. interrogators numerous alternative stories of how he lost his leg, see J.E. 18, 19, 21, 23, but none is believable in the face of the

---

[6] Khalifh's declaration denies that he ever was a member of the Taliban. J.E. 13. His counsel attempted to rectify the apparent contradiction by contending that during this week Khalifh might have tried, but failed, to join the Taliban.

10

obvious inference and additional supporting evidence. In one interview Khalifh admitted to losing his leg while clearing mines for the Taliban. J.E. 97 (window period). This could be discounted, by itself, because it occurred during the window period, but it has independent corroboration. Arkam Mohammed Ghafil Al Karim (ISN 653), who fought on the front lines with the Taliban against the Northern Alliance in 1999, stated in an interview while detailed at GTMO that he visited "Omar the Libyan" at a hospital after Omar had lost his right leg clearing mines. J.E. 156. Al Karim identified Khalifh as the person he meant by "Omar the Libyan."[7] Id.

From the time he lost his leg until early 2001, it is undisputed that Khalifh stayed in a number of guesthouses in Afghanistan, recuperating from his injury. See generally J.E. 56, 58, 96, 110, 147; Merits H'g Tr. 127-44, 147-49. When interrogated by U.S. officials at GTMO, he was able to pinpoint these guesthouses on maps and describe whom he met there. While petitioner disputes the characterization, it is clear from the record that these were al-Qaida guesthouses. The government presented evidence too extensive to cite showing that Khalifh met

---

[7] Moreover, while numerous individuals in the area at the time went by the *kunya* "Omar al Libi," see J.E. 115, it is unlikely that more than one lost his right leg by clearing mines in the relevant timeframe.

11

numerous top-level al-Qaida and Taliban leaders at these guesthouses. I find Khalifh's presence at these guesthouses to be the government's strongest evidence. Whatever interaction he might have had with the top terrorists he met, whether it was limited or extended, his presence with them at guesthouses is quite powerful support to the inference that he was considered a member of al-Qaida (and/or associated forces) at the time. Without such an understanding, he would not have been permitted to be around so many terrorist leaders for any amount of time.[8]

Petitioner stayed in several hospitals in the same period during which he stayed at the guesthouses. J.E. 13, 19, 94; see also J.E. 154, 156. Petitioner argues that his many stays in hospitals demonstrate that he spent a limited amount of time at guesthouses with al-Qaida leaders, but the hospital evidence is less exculpatory than he claims.

---

[8] The government also attempted to show that Khalifh worked for Osama bin Laden as an arms dealer during the period following his leg loss, but I find that it has not succeeded in proving this point. ▮

12

Arkam Al Karim (ISN653) stated that he, along with other front line Taliban fighters, visited "Omar al Libi" at Wazeer Akhbar Khan Hospital in 1998 in order to "pay their respects." J.E. 156. As discussed above, the Omar al Libi described by Al Karim is very likely Khalifh. The clear inference from Al Karim's statement is that he and other Taliban members were paying respects to Khalifh as a wounded fellow member of the Taliban and/or al-Qaida.

**D. 9/11 to Capture in Pakistan in 2002**

Khalifh maintained contact with terrorists in the period after September 11, 2001. He continued to interact with LIFG members after 9/11, including Faisal al-Libi and Ibrahim al-Libi.[9] J.E. 94.[10] He also admitted (in an interrogation during the window period) to being asked by an al-Qaida operative, Abu Faraj, to teach al-Qaida members about the operation of mines. J.E. 36. While there is no evidence that Khalifh actually fulfilled that request, the fact that he was asked (if true) supports the idea that he was considered to be part of al-Qaida.

---

[9] The LIFG may have aligned more closely with al-Qaida by the time of 9/11, as it issued a communiqué soon after advocating attacks on Americans. J.E. 189.

[10] The interview related in J.E. 94 occurred ████████. It is unclear if it falls within the "late 2004" window period.

13

I am not convinced by the government's contentions that Khalifh was present for the fight against the U.S. in the mountains of Tora Bora and at Taloqan in Novemeber and December of 2001.[11] I note that the government concedes that there is absolutely no evidence of what Khalifh might have actually done at those locations - i.e., no evidence that Khalifh personally lifted a hand against the U.S. or his allies. The government's most convincing evidence is a series of purported confessions. During an interrogation in the window period, Khalifh told interrogators the number of Arabs he believed fought on the front lines in Afghanistan after 9/11.[12] J.E. 39. In a second interrogation in the window period, Khalifh purportedly "slipped," according to his interrogator, and admitted to being at Taloqan and Tora Bora. J.E. 47. During a third interrogation in June 2005 (presumably outside of the "early 2005" window period), Khalifh stated that unlike

---

[11] Tora Bora, located in a mountainous region in Afghanistan near the Pakistani border, is a man-made cave complex that could support over a thousand people. J.E. 9. In November 2001, top al-Qaida members retreated to Tora Bora, resolved to make a last stand against U.S. and allied forces there. Id. American and Afghan forces arrived in December, eventually causing many of the al-Qaida members in the caves to flee for Pakistan, where many of them were later captured. Id. Taloqan was the location of additional fighting between coalition forces and al-Qaida. Id.

[12] While the government argues that this implies Khalifh was indeed present at Tora Bora, Khalifh never says when, or what he means by the "front lines." Moreover, while he states that there were "200 Arabs" on the front lines, id., this contradicts the government's expert's statement that Tora Bora housed one to two thousand fighters during the battle. See J.E. 9.

14

certain Afghan prisoners who he believed should not be detained because they were "only" Taliban members, he stated he was "guilty" and deserved to be held. J.E. 28. He also objected to the release of certain European detainees, in comparison to the continued to detention of the Afghan detainees, and said that he had been present to see some of the Europeans attacking American forces. Id.

The government has failed to establish probable cause to believe Khalifh was present for fighting at Tora Bora and Taloqan. The first purported confession is not really a confession at all. The second is characterized as a slip, without follow-up by the interrogator, and came during a time of alleged mental distress. The third alleged confession is ambiguous at best, and during that interrogation Khalifh was extremely angry about the treatment of the Afghan prisoners. J.E. 28. The record is clear that Khalifh is an emotional person and prone to outbursts, not all of which are truthful. Moreover, the government has presented no corroboration to the alleged confessions. And while it is amazing what people can do without their limbs (think: Lord Nelson at Trafalgar),

Khalifh's leg injuries strongly mitigate against the idea that he could have traversed the mountains of Tora Bora.[13]

Regardless of whether he fought at Tora Bora or Taloqan, it is undisputed that Khalifh eventually found his way to Pakistan. In Pakistan, he was captured at a guesthouse in Jalalabad by Pakistani authorities in March 2002.

## Conclusion

While I am not convinced by the government's evidence related to Tora Bora or Taloqan, the "part of al-Qaida" determination is a construct of all of the evidence. Looking at the case from this perspective, the government has shown more than probable cause to believe that Khalifh was a part of al-Qaida and associated forces through a steady string of activity right up until the time of his capture.[14] In the Sudan, he worked for bin Laden's trucking company, received training in guerrilla tactics, and followed direct LIFG orders at least once to leave Sudan.

---

[13] Khalifh once boasted that he could run with his prosthetic leg, J.E. 19, but there is no corroboration of this in his medical records. Cf. J.E. 116 (medical records) at 784 (noting that when Khalifh was given a new prosthetic leg with specialized shoe in 2005, he was able to walk 60 meters without a walker).

[14] The government also proved that Khalifh was a part of the LIFG, but I need not determine whether LIFG membership alone supports detention; I take Khalifh's LIFG participation to be important mainly because his LIFG activities increasingly blurred with al-Qaida activities. Similarly, Khalifh's participation with the Taliban is best viewed as a tributary of his al-Qaida membership, rather than as an independent ground for detention.

In Afghanistan, he trained jihadists at al-Qaida training camps, attempted to clear mines with the Taliban, and recuperated from the loss of his leg at al-Qaida safe houses where top al-Qaida personnel were present. After 9/11, with an attack by the U.S. imminent, al-Qaida and LIFG members in Afghanistan regarded Khalifh as enough of a fellow traveler to continue to meet with him. While I find that the government has not shown that Khalifh was at Tora Bora or Taloqan or that he personally took up arms against U.S. or coalition forces, it is slicing the law too thin to require such proof. Given the clear proof of his long-standing membership in al-Qaida and the LIFG, and the absence of any evidence of active dissociation or of a compellingly lengthy lapse in activity (as in Salahi), I find that Khalifh was a part of al-Qaida at the time his capture. Accordingly, the petition for writ of habeas corpus is denied. It is SO ORDERED.

JAMES ROBERSTON
United States District Judge

17